# AFFIDAVIT

I, John Charles Hill, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is submitted in support of a criminal complaint and arrest warrant against MARCO MARQUEZ CHAVIRA (CHAVIRA). As set forth herein, there is probable cause to believe that, on or about June 7, 2023, CHAVIRA violated a federal drug law, specifically 21 U.S.C. § 846, by knowingly and intentionally conspiring to possess with intent to distribute 500 grams and more of a mixture or substance containing a detectable amount of methamphetamine, a schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii) (hereinafter referred to as the "Subject Offense").

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since December 2022. I have been a law enforcement officer since January of 2015. Prior to becoming a Special Agent, I worked for the Town of Leesburg Police Department in Virginia from January 2015 to May 2017. In May 2017, I was hired by the Fairfax County Police Department in Virginia where I served until transitioning to the Special Agent position in December of 2022. I am currently assigned to the FBI Denver Division Strike Force Group II

(SFG-2), where I am assigned to investigate Drug Trafficking Organizations (DTO's) and other criminal enterprises.

2. As a Police Officer, I attended the Northern Virginia Criminal Justice Academy and obtained my Department of Criminal Justice Services Police Certification, during which time I received training in various elements of law enforcement. These included legal training, defensive tactics, driving, crime scene processing, and evidence handling. Following graduation, I was assigned as a patrol officer where I conducted investigations in the Town of Leesburg of numerous violations to include but not limited to narcotics violations. After being hired by the Fairfax County Police Department, I was assigned to patrol where I conducted investigations of various crimes within the County of Fairfax. In 2020 I transitioned from patrol to the Fairfax County Police Neighborhood Patrol Unit, a specialty unit, with the primary of goal of investigating narcotics, gangs, and shootings. As a police officer, I frequently encountered a wide range of criminal behavior. Through those experiences I gathered general knowledge about street level drug crimes and the common illicit substances seen within. I coordinated resources and managed a multitude of complex crime scenes included but not limited to robberies, burglaries, sexual assaults, and homicides. This is not an all-encompassing list of duties, knowledge, or skillsets obtained during my tenure as police officer.

3. As an FBI Special Agent, I completed the new agent training in Quantico, Virginia. I am currently assigned to the Denver Division, Organized Crime and Drug Enforcement Task Force (OCDETF) and have been since April 2023. My law enforcement experience as a police officer and as a Special Agent includes, but is not limited to, analyzing a subject's financial records, communications, and travel, analyzing pen register/trap and trace records, conducting interviews, recruiting and operating confidential informants, conducting

physical surveillances, preparing affidavits, conducting physical and electronic searches, and arresting subjects of criminal investigations.  In areas where I have less familiarity, I receive on the job training from experienced law enforcement officers recognized as subject matter experts in the areas of complex drug distribution, firearms trafficking, money laundering, and gang activities of individuals and criminal enterprises.

4. I am familiar with many commonly abused drugs, including cocaine, heroin, marijuana, ecstasy, crack cocaine, fentanyl, and methamphetamine; their appearance, methods of use, manufacturing, distribution, packaging, and concealment; and slang terms frequently used to refer to these drugs and things closely related to their use and distribution.

5. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.

  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e. Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f. Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g. Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h. It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and

suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

6. This Affidavit is submitted for the limited purpose of securing a criminal complaint and arrest warrant. As such, I have not included each and every fact known to me or other law enforcement officers concerning this investigation. Instead, I have set forth facts that I believe are necessary to establish probable cause to believe that on or about June 7, 2023, the Defendant, MARCO MARQUEZ CHAVIRA, knowingly and intentionally committed a violation of the Subject Offense within the State and Federal District of Colorado

### III.  STATEMENT OF PROBABLE CAUSE

7. The United States, through the Federal Bureau of Investigation (FBI), is conducting a criminal investigation of CHAVIRA regarding possible violations of 21 U.S.C. §§ 841 and 846.

8. In May 2023, a Confidential Human Source (CHS-1), started communicating with CHAVIRA regarding the purchasing of drugs, determining drug prices per quantity, and the coordination of controlled drug purchases between CHS-1 and CHAVIRA.

9. In this investigation, the FBI has employed CHS-1. CHS-1 was originally opened as a CHS in support of Drug Enforcement Administration (DEA) investigations in 2018. CHS-1 was encountered following his/her arrest by the DEA in that year. CHS-1 was opened with the FBI in December 2020 and has conducted multiple successful operations for the FBI and the DEA. CHS-1 has a criminal history which includes theft, assault, vehicular eluding, felony menacing, and burglary. CHS-1 was originally motivated by a desire to avoid charges in connection with his/her 2018 arrest and is currently motivated by a desire to stay in the United

States and is provided immigration benefits by the United States Government. CHS-1 is also receiving payments for his/her services. To you affiant's knowledge, CHS-1 has never provided information which was proven to be false. Your affiant believes the information provided by the CHS to be true and credible.

10. In the middle of May, CHS-1, at the direction of the FBI, attempted to purchase three pounds of methamphetamine from CHAVIRA. However, that deal did not occur because on the day of the deal, CHAVIRA was not timely, and the FBI terminated the operation. In late May, CHS-1, at the direction of the FBI, successfully coordinated a purchase of methamphetamine and suspected fentanyl pills through CHAVIRA. CHIVARA had these drugs delivered by a member of his drug trafficking organization.

11. After that deal, on May 31, 2023, CHS-1 spoke with CHAVIRA on 720-481-6512. CHAVIRA said he was currently in possession on 60 pounds of methamphetamine and a large quantity of cocaine. CHAVIRA stated the cocaine was difficult to sell right now and would sell it to CHS-1 for $19,500 USD per kilo.

12. On June 2, 2023, a subpoena was sent to T-Mobile for cellular phone number (720) 481-6512 and the subscriber information was revealed to come back to MARCO MARQUEZ CHAVIRA, at 8899 Pearl Street Apartment 1603, Denver, Colorado. T-Mobile also provided the International Mobile Equipment Identifier (IMEI) for (720) 481-6512 as: 3545197458407106.

13. FBI Staff Operations Specialist Jackie Kaste inquired in law enforcement databases regarding "MARCO MARQUEZ CHAVIRA" at "14056 E. Vasser Ave Apt 0304 Aurora, Colorado" and found a record of a CHAVIRA, date of birth 3/25/1986. Immigration database inquiries identified a MARCO MARQUEZ CHAVIRA with the same date of birth. And, CHS-1 identified the voice on 720-481-6512 as the same individual who coordinated the controlled purchase earlier in May, namely CHAVIRA. CHS-1 also identified CHAVIRA from a driver's license photo on June 2, 2023.

14. CHS-1, at the direction of the FBI, contacted CHAVIRA to purchase narcotics from him. In the days leading up to June 7, 2023, CHS-1 was in contact with CHAVIRA. CHS-1 requested to purchase four (4) pounds of methamphetamine and 3,000 fentanyl pills from CHAVIRA. On June 7, 2023, CHS-1 contacted CHAVIRA to confirm that they could do a deal for the methamphetamine and fentanyl pills. CHAVIRA agreed and said that another member of his group would contact CHS-1. CHAVIRA advised CHS-1 that his associate would retrieve the narcotics and then meet the CHS at a Walmart around 2:00 P.M.

15. CHS-1 arrived at this location and placed phone calls with CHAVIRA and his network. He spoke with CHAVIRA's courier who told CHS-1 that he could not do the full methamphetamine deal anymore, because he conducted both a fifteen-pound and a twenty-pound deal earlier in the day. Due to this change CHS-1 agreed to a new deal for two-and-a-half pounds of methamphetamine (instead of the original four pounds) and 3,000 fentanyl pills. The new deal was agreed to be conducted at the parking lot of Mariscos El Rey 2, located at 10293 East Iliff Avenue, Aurora, Colorado. CHS-1 was familiar with this location, because it was the same location at which CHS-1 conducted the narcotics transaction in early May.

16. Prior to the deal FBI surveillance arrived at the new deal location. They observed a male walk from the vicinity of a white Mercedes to the driver's side door of a gold Nissan sedan in the Mariscos El Rey 2 parking lot. The male appeared to be communicating on the phone and to the driver of the gold sedan. The driver of the gold sedan then handed a bag to the male. The male then walked back toward the white Mercedes. The gold Nissan began to leave the parking lot, then stopped, reversed, stopped again, and the horn honked. At this time both the white Mercedes and the gold Nissan left the parking lot.

17.     CHS-1 then arrived at the Mariscos El Rey 2 parking lot.  The white Mercedes parked directly west of CHS-1's vehicle.  The driver of the white Mercedes, who was the same male from earlier, exited the white Mercedes and entered the passenger side of CHS-1's vehicle.  Once inside, the male told CHS-1 that he only had two pounds of methamphetamine. CHS-1 provided the male $5,800.00 for two pounds of methamphetamine and three thousand fentanyl pills.  The male then exited CHS-1's vehicle and entered the white Mercedes.  CHS-1's vehicle, the white Mercedes, and the gold Nissan sedan then all left the parking lot.

18.      FBI Agents conducted surveillance of the deal, and searched CHS-1 to ensure that CHS-1 did not have any narcotics on their person or in their car prior to the deal. At the conclusion of the deal, which was set up with CHAVIRA and executed by his currier, Agents recovered from CHS-1 approximately two pounds of suspected methamphetamine and approximately 3,000 pills which your Affiant believes contains fentanyl.  Special Agents John Hill and Michael Catalano tested the suspected methamphetamine with a NIK kit, which indicated presumptive positive for the presence of methamphetamine.  The methamphetamine was then packaged and weighed.  The weight of the methamphetamine was 944.6 grams.  The methamphetamine was then turned into the FBI evidence control room to be sent to the DEA laboratory qualitative and quantitative testing and are pending results.

## IV.  CONCLUSION

19.     For the reasons described above, there is probable cause to believe that MARCO MARQUEZ CHAVIRA committed a violation of 21 U.S.C. § 846, by knowingly and intentionally conspiring to possess with intent to distribute 500 grams and more of a mixture or

substance containing a detectable amount of methamphetamine, a schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii).

                                        *s/John Charles Hill*
                                        John Charles Hill, Special Agent
                                        Federal Bureau of Investigation

Submitted, attested to, and acknowledged by reliable electronic means before me on this 16th day of November, 2023.

/James P. O'Hara

HON. JAMES P. O'HARA
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO

**Affidavit reviewed and submitted by Assistant United States Attorney Alexander Duncan.**